## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALHAJI KAMARA | )<br>)<br>)<br>)  Crim. No.: 06-333(RJL)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Mr. Alhaji Kamara, through undersigned counsel, respectfully submits his Memorandum in Aid of Sentencing.

**Procedural History**

Mr. Kamara will appear before the Court on Monday, October 22, 2007 for his Sentencing Hearing. On November 16, 2006, Mr. Kamara entered a guilty plea to one count of bank robbery. The Criminal Information charged him with two counts of Bank Robbery in violation 18 U.S.C. § 2113(a). According to the factual proffer Mr. Kamara committed the bank robberies on October 6, 2006.

Pursuant to the conviction Mr. Kamara faces a maximum sentence of twenty years imprisonment, a fine of up to $250,000.00 dollars and a maximum term of supervised release of three years. Probation Officer Kelly Kraemer-Soares in her Pre-Sentence Investigation Report (the "PSR") calculated a sentencing guideline range of 46 to 57 months pursuant to the advisory United States Sentencing Guidelines. The range is based on a final Base Offense Level 21 and a Criminal History Category III.

**Factual Background**

Mr. Kamara committed the two bank robberies on the same day, October 6, 2007, in the same neighborhood (Gallery Place/Chinatown) and he was arrested minutes away from the two banks that he robbed. In each robbery, Mr. Kamara utilized the same modus operandi through the use of a threatening demand note. Mr. Kamara was arrested within twenty minutes after robbing the second bank. When the officers spotted Mr. Kamara, he did not attempt to run or in anyway resist arrest. After he was booked at the District Police station, Mr. Kamara gave a voluntary oral statement and submitted to a video-taped statement. In each statement Mr. Kamara confessed to robbing a bank twenty minutes earlier and to robbing another bank approximately seven hour earlier that day.

**Personal Background**

Alhaji Kamara is a citizen of Sierra Leon who has been residing in the United Sates for at least the last sixteen years. As Probation Officer Kelly Kraemer-Soares noted, there is a discrepancy regarding when Mr. Kamara entered the United States. Moreover, Mr. Kamara informed Dr. Elissa R. Miller who examined him at the Metropolitan Correction Center in New York, that he immigrated to the United States in1982 when he would have been twelve years old. By any standard sixteen years is a significant period of time and it covers Mr. Kamara's entire adult life.

By all estimates Mr. Kamara's stay in the United States has been checkered with periods of employment, family stability followed by divorce, separations, child support payment orders, and criminal convictions. Beyond that Mr. Kamara has had to struggle with significant mental health crises that have at times totally devastated his life. It is in the context of his mental health history that Mr. Kamara's aberrant and bizarre criminal behavior can be better understood. In view of his mental health history, a sentence of forty six (46) months is a reasonable sentence and more than

adequately takes into account the directives 18 U.S.C. § 3553(a).

**A.     PURSUANT TO <u>UNITED STATES v. BOOKER</u> , 18 U.S.C. § 3553(a), 18 U.S.C. § 3582, AND 28 U.S.C. § 991(b)(1)(B) COUNSEL REQUESTS THAT THE COURT SENTENCE MR. KAMARA TO A PRISON TERM OF FORTY SIX MONTHS**

In <u>United States v. Booker</u>, the Supreme Court held that the mandatory sentencing guidelines were unconstitutional as applied. 125 S. Ct. 738 (2005)  The Court further held that judges are required to "take account of the Guidelines <u>together</u> <u>with</u> other sentencing factors," and to "consider" the guidelines along with all the other required factors (emphasis added).  The Court is not bound by the guideline range and there is no requirement that a sentence be within the guideline range.  The guideline range is just one factor to be considered along with the mandatory statutory factors delineated in 18 U.S.C. § 3553(a).

 Those factors  include, among others, the nature of the offense, the defendant's history, the need for the sentence to promote adequate deterrence and to provide the defendant with the needed educational or vocational training, and pertinent policy statements issued by the sentencing commission, the need to avoid unwarranted sentencing disparities among similarly situated defendants. <u>U.S. v. Clifton Price</u> 409 F.3d 436, 442 (D.C. Cir. 2005) Moreover, Sentencing Courts have a continuing duty to "[w]eigh the purposes of sentencing listed in the Sentencing Reform Act." <u>U.S. v. Jabber</u> 362 F.Supp.2d 365, 369 (D. Mass. 2005).

The primary purpose of the sentencing statute, 18 U.S.C. 3553(a), is for the sentencing court to impose a sufficient sentence, but not one that is greater than necessary.  18 U.S.C. § 3553(a) allows the Court to take into account the particularized factors of Mr. Kamara's life and not just the fact of his criminal conduct. This approach is consistent with the goals of 28 U.S.C § 991, the enabling statute of the Sentencing Commission.  The enabling statute and the sentencing

statue contemplate a flexible and particularized approach to sentencing determinations that were abandoned under the pre-<u>Booker</u> mandatory sentencing guideline regime. 28 U.S.C. § 991(b)(1)(B) supports a sentence that is not determined, solely, by a vertical/axis formula that ignores the statutory factors set forth in 18 U.S.C. § 3553(a).

Congress created the Sentencing Commission with the goal of developing a methodology and structure that would guide Courts in achieving uniformity and fairness in sentencing. However, the enabling statute did not lose sight nor preclude the notion of individualized sentencing. 28 U.S.C. § 991(b)(1)(B) provides Sentencing Courts with discretion to "maint[ain] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." Application of 18 U.S.C. § 3553(a) along with the flexibility encouraged by 28 U.S.C. § 991(b)(1)(B) support a sentence at the low end of the applicable guideline range.

**The Nature and Circumstances of the Offense**

Mr. Kamara's criminal conduct took place while he was in the middle of a mental health crisis. When he committed the bank robberies Mr. Kamara had been without his prescription medication for days and he was suffering from sleep deprivation. Beginning in 2002, Mr. Kamara was prescribed pyschotropic medication to control and stabilize the severe mental health symptoms that he had begun to experience. Since then at various times, Mr. Kamara has been prescribed Prozac, Cogentin, Haldol, Zoloft and other medication to treat his Depression and Schizophrenia.

Mr. Kamara's mental and physical debilitation was compounded by his use of crack cocaine. In fact, the bank robberies were motivated by his need to obtained more crack cocaine.

While Mr. Kamara's decision to abuse crack cocaine suggests purposeful and intentional criminal conduct, his mental health history suggests a diminished capacity to properly appreciate the wrongfulness of his conduct.

Mr. Kamara committed the instant offense while suffering from a significantly reduced mental capacity, which contributed substantially to the commission of the bank robberies. Admittedly his diminished mental capacity was substantially brought on by his use of crack cocaine. The latter precludes him from satisfying the requirements for a departure pursuant to U.S.S.G § 5K2.13. Although, the plea agreement precludes Mr. Kamara from moving for a downward departure, his mental history and his diminished capacity at the time he committed the bank robberies fall squarely under the statutory considerations regarding his personal history and characteristics.

His mental health history shows a strong corollary between the severity of his criminal conduct and his mental deterioration. Mr. Kamara's verified criminal history begins in 1994 with Criminal Contempt charges for failure to appear and for theft. Regrettably his conduct then starts turning assaultive. Thus within a twelve year period Mr. Kamara's criminal conduct turn dramatically more violent. At the same, Mr. Kamara intermittently showed that he could conduct himself responsibly and that he could be productive citizen. Even while he is moving with his family from one state to another, he found gainful employment and learned supervisory skills in factory jobs. Sadly, on two occasions Mr. Kamara had to stop working because he recognized that his mental health was suffering in a very significant way.

**History and Characteristics of Mr. Kamara**

Mr. Kamara was born in Freetown Sierra Leon and came to the United States with his

parents. While his parents and two siblings settled in England, Mr. Kamara has continuously resided in the United States. In the United States, Mr. Kamara has attended school and found gainful employment. It appears that as an adolescent and young adult Mr. Kamara was not afflicted by the mental illnesses that would surface later in his life.

Although, Mr. Kamara appeared to have a solid family foundation for some reason he was drawn to alcohol and marijuana at a very young age. Remarkably he sustained his alcohol and marijuana use throughout his teenage years. Regrettably, as a young adult he started abusing crack cocaine. His addiction to crack cocaine was initially controlled on account of incarceration. Then for a five-year period between 1995 and 2000, Mr. Kamara managed to abstain from using crack cocaine. Unfortunately, once Mr. Kamara relapsed he was unable to make a complete break from using crack cocaine.

While in the throes of his addiction, Mr. Kamara started experiencing the symptoms of serious mental illnesses. His struggles with mental illnesses culminated with three separate suicide attempts. Each attempt appeared to be related to both substance abuse and reactions to personal problems relating to his partner or the death of an immediate family member. After each attempt, Mr. Kamara was admitted on an inpatient basis to either St. Elizabeth's Hospital or to Prince George's Hospital. With each hospital admission it appeared that Mr. Kamara's mental health was further deteriorating.

During the pendency of his case, Mr. Kamara has continued to struggle with his mental illness. Throughout his pre-trial incarceration he has battle with sleep deprivation and hearing voices. Both symptoms have only added to his isolation and anxiety. In short, even a modicum of normalcy continues to elude Mr. Kamara. Mr. Kamara without a doubt presents acute

sentencing challenges regarding the best way to further his rehabilitation. Ironically, confinement in the Bureau of Prison may very well provide the necessary structure of services that will give Mr. Kamara the chance to stabilize his life. If he is recommended to a facility like FCI Butner in North Carolina Mr. Kamara will receive the medical attention and treatment that he desperately needs. Equally important, incarceration will break his access to illegal drugs.

**The Sentence should reflect the Seriousness of the Offense**

Mr. Kamara recognizes that the Court must impose a sentence that reflects the seriousness of the offense, that promotes respect for the law, and provides just punishment. While the sentence must provide deterrence and protect the public, it must also provide Mr. Kamara with educational and vocational training and medical care. In balancing all of the purposes of sentencing, the Court must also impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2)[§ 3553]." See 18 U.S.C. § 3553(a).

Mr. Kamara recognized the seriousness of his criminal conduct and readily took responsibility for his actions. Immediately after his arrest Mr. Kamara took responsibility for robbing the bank. Noteworthy was his voluntary admission of robbing a bank when he was not even questioned about that particular crime. Once his criminal case was before the Court, Mr. Kamara was clear in his desire to enter a guilty plea. Mr. Kamara wanted to plea guilty knowing full well that he would be punished for his conduct.

**The sentence should afford adequate deterrence to criminal conduct**

A sentence of forty six months of incarceration will certainly protect the community from Mr. Kamara, and not just for the forty six months. According to the Department of Homeland

Security Mr. Kamara is not a naturalized citizen of the United States. As a result it is very likely that he will be deported from the United States. At a minimum there is a guarantee that Mr. Kamara will not return to the community for the duration of his confinement in the Bureau of Prison.

Although Mr. Kamara is a citizen of Sierra Leon he has not set foot there in nearly twenty years. On the contrary, Mr. Kamara has spent the formative years of his life in the United States. To that end all his associations, interests, family ties, work experience have developed and taken root in the United States. To be deported at some point in his forties to a country where he has no close family member or friends will be emotionally jarring. His problems will be even more acute given the social, economic and political disarray that Sierra Leon continues to struggle with.

Sadly, Mr. Kamara will return to his native country penniless and with very little to show for the many years that he has resided in the United States. Ironically, Mr. Kamara will take back emotional and physical scars from his stay in the Untied States. As the PSR notes, Mr. Kamara suffered extensive burns to his body while working in a factory. See PSR ¶ 49. The severe burns that he sustained resulted in his hospitalization and skin grafting procedures. The severity of his injuries required that his physical rehabilitation was extended for an entire year. While his physical scars have healed, it is Mr. Kamara's mental health that will present extraordinary challenges in Sierra Leon.

In the United States, Mr. Kamara has had the benefit of receiving inpatient treatment at St. Elizabeth's Hospital. Afterwards he was very fortunate to come under the care and guidance of Mr. Ed Eller and Community Connections. With their help, Mr. Kamara began to receive the

proper medical attention and counseling that allowed him to lead a relatively normal life. To that end, Mr. Kamara obtained gainful employment as a Lead Steward in the Verizon Center. It is nothing less than remarkable that Mr. Kamara went from placement in a suicide ward in St. Elizabeth's Hospital to gainful employment at the Verizon Center.

Unfortunately, it is extremely doubtful that Mr. Kamara will be able to obtain that level of counseling, medical attention and medication - for free - in Sierra Leon. To this day an impoverished Sierra Leon struggles to move beyond the ghastly cruelties of a civil war that lasted eleven years. Seen in this light, the community, the United States, will be permanently protected from Mr. Kamara.

**The sentence should provide the most effective rehabilitation treatment**

There is no doubt that Mr. Kamara requires rehabilitation treatment. In fact, he requires specialized treatment that will address his Major Depressive Disorder, Polysubstance Dependence, and Antisocial Personality Traits.[1] Each diagnosis presents specific and significant challenges on their own. The combination of three mental illnesses only makes Mr. Kamara's situation all the more dire and urgent. Accordingly, Dr. Miller's suggestion that Mr. Kamara should be placed in an 18-month Residential Drug Treatment Program should by all means be followed.

The Residential Drug Treatment Program and the consistent administration of medication should stabilize Mr. Kamara and allow him to lead a relatively normal life when he is released from prison. The biggest concern is whether Mr. Kamara will be able to maintain the mental health stability after he leaves the Bureau of Prison. The concern is all the more urgent given his

---

[1] See Dr. Elissa R. Miller's Criminal Responsibility Evaluation at 10-11.

likely deportation to Sierra Leon. As Mr. Kamara related to Probation Officer Kraemer-Soares and to Dr. Miller, his closest relative is his sister Mariama Kamara who lives in Maryland. It is a reasonable concern that once Mr. Kamara is deported to Sierra Leon he will be without any support. Returning to a society that he will not have seen for over twenty years will be an extremely daunting challenge for Mr. Kamara. Given the many challenges facing Mr. Kamara a prison sentence of forty six months that will likely be followed by mandatory deportation, is "just punishment".

### **CONCLUSION**

Mr. Kamara's life has tragically spiraled out of control. At this point the best that one can hope for is that Mr. Kamara receives the medical care and treatment he urgently needs. Hopefully, the Bureau of Prison will provide the rehabilitation that will allow Mr. Kamara to lead the remainder of his life free of the psychological demons and drug addictions that have plagued his life since he was a child. For the foregoing reasons undersigned counsel respectfully requests that the Court impose a sentence of forty-six months of incarceration.

Respectfully submitted,
A.J. Kramer
Federal Public Defender


_____/s/_____
Carlos J. Vanegas
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
